381 So.2d 356 (1980)
FOLIAGE CORPORATION OF FLORIDA, INC., Appellant,
v.
Daniel E. WATSON and Wilma B. Watson, Appellees.
No. 78-207/NT4-76.
District Court of Appeal of Florida, Fifth District.
March 26, 1980.
*357 Thomas B. DeWolf and Terrell Griffin, Orlando, for appellant.
Maxwell W. Wells, Jr., Orlando, for appellees.
FARRINGTON, OTIS, Associate Judge.
This is an appeal from an Amended Final Judgment based on a jury verdict awarding damages to the lessors of a nursery for waste to the leased property and conversion of stock plants[1] which under the terms of the lease remained the property of the lessors.[2]
On April 1, 1975, appellees Daniel E. Watson and Wilma R. Watson, leased their nursery property to appellant Foliage Corporation of Florida, Inc., for three years commencing June 1, 1975, by written lease, containing a clause permitting termination by the lessee on any yearly anniversary date by giving ninety days prior written notice to the lessor. The lessee gave timely notice and thereby exercised its option to terminate the lease at the end of the first year.
During the term of the lease the stock plants were kept in beds on raised benches in an area covered with shade cloth which was referred to during the trial as "E" area. The stock plants supplied by the lessors, which had previously been kept in another building, were divided and planted in beds in "E" area. In addition to the stock plants supplied to it by the lessors, Foliage Corporation planted in beds in "E" area some stock plants which it purchased from outside sources and some which it grew from vine cuttings received under the terms of the lease.
Between May 5, 1976, and May 8, 1976, while in the process of vacating the nursery, *358 Foliage Corporation began removing some of the stock plants from "E" area. A bitter dispute arose between plaintiff Daniel E. Watson and the principals of Foliage Corporation, over which plants in "E" area were the property of the lessors and should remain in the nursery, and which were the property of the tenant and could be removed. Plaintiffs conceded that Foliage Corporation was entitled to remove any stock plants purchased from outsiders or grown by it from vine cuttings, but both lessors and lessee claimed the additional stock plants resulting from division of the lessors' original stock plants. Also there was dispute as to which of the stock plants in "E" area were lessors' original plants.
The dispute became aggravated to the extent that lessor Daniel E. Watson blocked the Foliage Corporation's truck which was removing stock plants from the nursery, accused the principals of Foliage Corporation of stealing his stock plants, called a deputy sheriff to the premises and demanded the arrest of the Foliage Corporation personnel, and threatened to kill John Crosby, the secretary of Foliage Corporation. In an effort to settle the dispute, a meeting was arranged at the office of an attorney employed by Daniel E. Watson on May 10, 1976.
At the trial the defendant, Foliage Corporation, proffered testimony in the absence of the jury that an oral settlement of the dispute was reached at this meeting, and that as a part of the settlement Daniel E. Watson on behalf of the lessors agreed that Foliage Corporation could have all the stock plants located in "E" area and could remove them during the remainder of the lease term, which would end May 31, 1976, without interference by the lessors.[3] The trial judge sustained the objection of attorney for plaintiffs to this proffered testimony, and no testimony of the alleged oral settlement of the dispute was heard by the jury.
The testimony was undisputed that following this meeting and during the last three weeks of the lease term Foliage Corporation removed the balance of the stock plants located in "E" area from the leased property except for a few that were in poor condition and of little value, without objection by the lessor. Since the lease specifically provided that the growing stock should remain the property of the lessors, the rejection of the proffered testimony that the tenant removed the stock plants pursuant to an oral settlement agreement with the lessors left the defendant without any effective defense; and the trial resulted in a jury verdict for the plaintiffs in the amount of $72,500.00, plus attorney's fees.
Appellant contends that it was error for the trial judge to refuse testimony of the alleged oral agreement reached by the parties in settlement of the dispute between the parties. We agree that evidence of the alleged oral settlement agreement should have been received and reverse the judgment.
Appellees contend that the evidence concerning the oral settlement agreement was properly rejected (1) by reason of the provisions of Florida Rule of Civil Procedure 1.030(d)[4]; (2) because the proffered settlement agreement constituted an attempt to modify the terms of the written lease by parol; (3) because the written lease was within the Statute of Frauds and could not be modified or compromised except in writing; and (4) because there was no consideration for the proffered oral settlement agreement.
*359 We disagree with appellees' contention that the proffered oral settlement agreement was rendered unenforceable by the provisions of Florida Rule of Civil Procedure 1.030(d). The Florida Rules of Civil Procedure are applicable to practice and procedure of litigants in court, but have no application to an oral settlement agreement of a dispute reached by the parties to the dispute prior to the commencement of any court action. The case of Moore v. Gunning, 328 So.2d 462 (Fla. 4th DCA 1976) relied on by appellees held that by reason of Florida Rule of Civil Procedure 1.030(d) an oral settlement agreement between litigants in a pending personal injury case was unenforceable. The holding in Moore is inapplicable to the situation in the instant case because in this case the parties were not in court at the time of the alleged settlement agreement. The case of National Surety Co. v. Willys-Overland, Inc., 103 Fla. 738, 138 So. 24 (1931) held "that, in the absence of statutory requirement, no particular form of agreement is essential to the validity of a compromise; and it need not be in writing unless it is so required by special statute." National Surety remains the law of Florida applicable to an oral compromise agreement between parties not involved in any court action.
We also reject appellees' contention that the proffered settlement agreement was inadmissible because it constituted an attempt to modify the terms of the written lease by parol. A written contract can be modified by a subsequent oral agreement when the oral agreement has been accepted and acted upon by the parties.[5] The defendant proffered testimony to the effect that the parties accepted and acted upon the settlement agreement modifying the terms of the written lease.
Appellees' contention that the proffered oral settlement agreement was properly rejected by reason of being within the statute of frauds should not have been considered. The defendant pleaded the settlement agreement as an affirmative defense in its answer. Plaintiffs filed their reply denying that any settlement agreement had been reached, but did not plead the statute of frauds in avoidance. Under the Florida Rules of Civil Procedure a plaintiff who seeks to avoid an affirmative defense is required to file a reply containing the avoidance. By failing to plead the statute of frauds in avoidance of defendant's affirmative defense of settlement, plaintiffs waived their right to raise it.[6]
Appellees' contention that there was no consideration for the proffered settlement agreement was not a proper basis for rejecting evidence of the agreement. The settlement of a disputed claim may constitute valid consideration for a settlement agreement. The issue of want of consideration should have been submitted to the jury under proper instruction.
Appellant contends that the court should have rejected the testimony of Ted Arthur, a real estate broker who testified as an expert on the issue of damages. He had appraised the nursery, including land, buildings, benches and stock plants for listing purposes in February 1976, when the stock plants were in "E" area, and arrived at a valuation of $400,000.00. He again appraised the nursery for listing purposes in May 1976, after the stock plants had been removed, and arrived at a valuation of $250,000.00. He estimated plaintiffs' damages at the difference between these valuation amounts, or $150,000.00. When called upon to explain $150,000.00 difference between the two appraisals, he testified that this difference was based on:
(1) His estimate that there were 40,000 stock plants in "E" area at the time of his February appraisal.
(2) His estimate that these stock plants were of the value of $2.25 each for a total of $90,000.00.

*360 (3) His assumption that these 40,000 stock plants were the property of plaintiffs.
(4) His assumption that all these stock plants were wrongfully removed by defendant prior to his appraisal in late May 1976.
(5) His estimate that plaintiffs would suffer loss of one year's pre-tax profits or $60,000.00 by reason of having no stock plants from which to propagate plants for sale.
It was error to permit this expert witness to testify over defendant's objection to a damage figure based on the assumption that all the stock plants in "E" area were the property of the plaintiffs. Although the percentage of the stock plants in "E" area owned by the tenant was in dispute, there was no dispute that the tenant owned some of the stock plants in "E" area. The expert witness should have been required either to base his damage estimate upon a number of stock plants within the range of the conflicting claims of the parties as to the percentage of the stock plants in "E" area owned by each, or to indicate to the jury that his total estimate of damage for the wrongful removal of stock plants should be reduced by a percentage figure equivalent to the percentage of stock plants in "E" area which the jury might find to have been owned by the tenant.
Since the case will have to be retried, we will discuss appellant's objection to the portion of the damage instruction relating to damages for the alleged wrongful removal of stock plants belonging to the lessors from the nursery,[7] although the point was not properly preserved by specific objection at the trial. The instruction given erroneously stated that the measure of damages for wrongful removal of the stock plants was the difference in the market value of the leased property before and after the wrongful removal, and erroneously included business damages as an item to be considered in determining market value.
The stock plants, which were planted in beds on raised benches rather than in the ground, were personal property. The proper measure of damages for their wrongful removal from the leased premises would be the reasonable market value of the stock plants wrongfully removed or, if the stock plants had no determinable market value, their actual value at the time of removal, with interest to the date of the verdict.[8] In addition plaintiffs would be entitled to recover business damages including loss of profits for the period reasonably required for replacement of wrongfully removed stock plants.
REVERSED AND REMANDED, for a new trial.
DOWNEY, JAMES C., and MOORE, JOHN H., II, Associate Judges, concur.
NOTES
[1] The specialty of the leased nursery was the growing of foliage plants known as variegated nephthytis. These plants were propagated by cutting off vines which are put out by mature plants called stock plants. The vines are cut into segments and planted in prepared beds. New plants grow from eyes at the joints or leaves of the cut-up vines, which are rooted in the prepared beds. A plant is mature enough to put out vines suitable for propagation after about one year. Vines for propagation are cut from the stock plants about three times a year. The rooted cuttings are generally sold commercially as foliage plants, but some from selected stock plants are permitted to mature into additional stock plants. After about two and one-half years a stock plant is split or divided, and the separate portions are replanted in fresh soil to maintain productivity.
[2] The pertinent lease provision provided:

11. The leased premises are to be used for the growing of nursery stock. Lessor agrees to maintain vines and plants of stock for Lessee as long as the stock remains in raised benches, and all such growing stock shall remain the property of Lessor, PROVIDED, HOWEVER, cuttings therefrom shall be made by Lessor for the sole use of Lessee, and the Lessor shall be responsible for maintaining said growing stock and caring for the same in a growing area not to exceed ten thousand (10,000) square feet.
[3] Both parties were represented by attorneys at the meeting. On May 11, 1976, the day following the meeting, the attorney for Foliage Corporation wrote a letter to the attorney for Daniel E. Watson and his wife setting forth his understanding of the terms of the agreement and asking that Mr. and Mrs. Watson confirm the settlement in writing on a copy of the letter and return the copy. The attorney for Mr. and Mrs. Watson forwarded the letter to his clients, but they made no reply and did not return the copy of the letter.
[4] Florida Rule of Civil Procedure 1.030(d) in pertinent part provides:

Stipulations. No private agreement or consent between parties or their attorneys shall be of any force unless the evidence thereof is in writing, subscribed by the party or his attorney against whom it is alleged... .
[5] Doral Country Club, Inc. v. Curcie Brothers, Inc., 174 So.2d 749 (Fla. 3d DCA 1965).
[6] Fla.R.Civ.P. 1.100(a); Sorensen v. Eshelman, 202 So.2d 597 (Fla. 3d DCA 1967); Tax v. Keiser, 328 So.2d 517 (Fla. 4th DCA 1976).
[7] The instruction was as follows:

It is your duty to determine and assess the damages which resulted from the removal of the stock plants which is the difference in the market value of the leased property immediately before and after the wrongful removal. In determining the market value you may consider (a) the use of the property for the growing of foliage plants and the productivity of the stock plants which were removed including the profits therefrom; and (b) the cost and expenses of replacing the stock plants; (c) the loss of business continuity and ability to service existing customers; and (d) the inherent value of the stock plants.
In addition to the quoted instruction the court correctly charged the jury that the measure of damages for defendant's alleged failure to keep and maintain all physical structures in the same condition as at the commencement of the lease term except for normal wear and tear would be the reasonable cost of restoring the structures on the leased premises to the condition required by the lease.
[8] 9A Fla.Jur., Damages, §§ 71, 73; 12 Fla.Jur.2d, conversion and Replevin, § 20.